**Lois E. ADAMS, et al., Plaintiffs,**

v.

**William Jefferson CLINTON, et al., Defendants.**

**Clifford ALEXANDER, et al., Plaintiffs,**

v.

**William M. DALEY, Secretary of Commerce, et al., Defendants.**

**Civil Action Nos. 98–1665– LFO, 98–2187–LFO.**

United States District Court, District of Columbia.

Nov. 6, 1998.

George S. LaRoche, Takoma Park, MD, for plaintiffs in *Adams*.

Theodore C. Hirt, John Russell Tyler, U.S. Dept. of Justice, Washington, DC, for William Jefferson Clinton and William M. Daley.

Kerry William Kircher, U.S. House of Representatives, Washington, DC, for Robin H. Carle, and Wilson Livingood.

Daniel A. Rezneck, D.C. Financial Responsibility & Management Assist. Author., Washington, DC, for District of Columbia Financial Responsibility & Management Assist. Authority.

John Marshall Smallwood, Smallwood & Wells, Largo, MD, for American Friends Service Committee, Inc.

Charles Alvin Miller, Thomas Samuel Williamson, Jr., Covington & Burling, Washington, DC, for Covington and Burling.

Walter S. Smith, Jr., Office of Corp. Counsel, Washington, DC, for Corp. Counsel.

## MEMORANDUM

OBERDORFER, District Judge.

Two complaints filed by two sets of residents of the District of Columbia allege that Congress has unconstitutionally excluded them from apportionment to a congressional district. Orders entered November 3, 1998, consolidated the cases. Preliminarily, both sets of plaintiffs request that their cases be set before a three-judge district court in the manner contemplated by 28 U.S.C. § 2284(b)(1). That statute requires the convening of such a court "when an action is filed challenging the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a). Whether a three-judge court is called for turns on: "(1) whether the complaint formally alleges a basis for equitable relief; (2) whether the constitutional question presented is substantial; and (3) whether the case presented otherwise comes within the requirements of the ... three-judge statute." *Police Officers Guild, Nat'l Union of Police Officers v. Washington,* 369 F.Supp. 543, 548–49 (D.D.C.1973).

### I.

The defendants named in the complaint in *Adams v. Clinton* include the President, ministerial officials of the House of Representatives, and the District of Columbia Financial Responsibility and Management Assistance Authority. The President and the House officials are alleged to have a role in effecting periodic apportionments to congressional districts as contemplated by Article I, § 2, cl. 3, of the Constitution; the *Adams* complaint seeks to enjoin their execu-

tion of any further apportionment until Congress has cured the claimed violations of plaintiffs' alleged constitutional rights. In addition, the *Adams* plaintiffs seek declarations that the present apportionments denying them representation in Congress violate their constitutional rights to a republican form of government and to the equal protection of the laws, as guaranteed by Article IV, § 4, and § 1 of the Fourteenth Amendment. These substantive complaints and plaintiffs' prayers for relief allege bases for equitable relief (which may or may not be granted) that clearly satisfy the first prong of the *Police Officers Guild* syllogism.

## II.

Whether either constitutional question is substantial presents a more difficult problem. It is plaintiffs' contention, essentially, that the results of the reapportionment process, mandated by Congress in lieu of decennial reapportionment legislation, *see Franklin v. Massachusetts,* 505 U.S. 788, 791–92, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), violate Congress' constitutional apportionment obligation. The process does not merely provide plaintiffs with disproportionate representation in Congress; it provides no representation—zero. *Compare Board of Estimate of New York v. Morris,* 489 U.S. 688, 702, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) *with Swann v. Adams,* 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). Thus, plaintiffs argue that the apportionment process deprives them of a republican form of government because it leaves them unrepresented in the legislative body (Congress) authorized by the Constitution "[t]o exercise exclusive Legislation in all Cases whatsoever" involving them and the political subdivision in which they reside, the District of Columbia. U.S. Const. art. I, § 8, cl. 17. Plaintiffs also claim that they are denied the equal protection of the laws because District residents, who are subject to Congress' "exclusive" legislative power, are not represented in Congress, while residents of former federal enclaves and other sites over which Congress is empowered to "exercise like Authority" are. *Id.* (defining other sites as "Forts, Magazines, Arsenals, dock-Yards, and other needful Build-

ings," e.g., the Bethesda Naval Hospital Complex).

A constitutionally insubstantial claim, for three-judge court purposes, has been authoritatively described as "essentially fictitious," *"wholly* insubstantial," *"obviously* frivolous," and *"obviously* without merit," words that "[i]n the context of prior [Supreme Court] decisions ... import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous...." *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973) (citations omitted) (emphasis added); *see also Washington v. Confederated Tribes,* 447 U.S. 134, 147–48, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *LaRouche v. Fowler,* 152 F.3d 974, 982–83, 986 (D.C.Cir.1998).

While plaintiffs cite no cases that embrace their theories, they emphasize that their claims raise original issues that have textual and tangential decisional support. For example, in another context they point to the following statement of the Supreme Court in *Board of Estimate of New York v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989): "[I]n this country the people govern themselves through their elected representatives and ... each and every citizen has an inalienable right to full and effective participation in the political processes of the legislative bodies of the [n]ation, [s]tate, [and] locality...." 489 U.S. at 693, 109 S.Ct. 1433 (citations omitted).

Plaintiffs also confront dictum of the D.C. Court of Appeals that the Guarantee Clause "applies to the states and cannot be read to restrict the power of Congress to legislate for the District." *Darby v. United States,* 681 A.2d 1156, 1158 (D.C.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996). Plaintiffs argue, however, that a D.C. Court of Appeals decision is not preclusive, that its dictum is supported by no relevant Supreme Court authority, and that the issue in *Darby* about jurisdiction of the D.C. courts involved a quite different question from those posed here. It appears that no case binding on this court resolves the question whether, in the context here, the District may or should be treated as State for the purpose of Article 4, § 4. *Cf.*

*District of Columbia v. Carter,* 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973).

The plaintiffs contend that no court has ruled authoritatively on the question whether a republican form of government, as that term is used in the Constitution, is denied to other persons unrepresented in the body that has authority "[t]o exercise exclusive Legislation . . . over" them and the District in which they live. Article IV, § 4, obligates "[t]he United States" (not just the Congress) to "guarantee to every State . . . a Republican Form of Government, and [to] protect each of them against Invasion . . . and . . . against domestic Violence." If, as it seems apparent, Article IV, § 4, obligates the United States to afford the District and its residents the same protection from "Invasion" and "domestic Violence" as is enjoyed by the several states and their residents, it may follow that, to the extent, if any, that Article IV guarantees to the states and their residents a republican form of government vis-a-vis the legislature that governs them, the District and its residents are entitled to the same guarantee—irrespective of whether the District is a State for the purpose of the Guarantee Clause. The plaintiffs' claims are not rendered "obviously without merit" by cases suggesting that the Guarantee Clause necessarily involved a political question. *See New York v. United States,* 505 U.S. 144, 183–86, 112 S.Ct. 2408, 2432–33, 120 L.Ed.2d 120 (1992).

Further, it is not obvious that plaintiffs' equal protection claim is frivolous. The mere fact that plaintiffs are not challenging a statute that draws explicit distinctions between the District of Columbia and other federal enclaves with respect to apportionment does not establish conclusively that they are not challenging an arguably discriminatory distinction drawn by Congress and affected by the apportionment process conducted periodically by defendants. Therefore the equal protection claim is not obviously without merit.

Then there is the Twenty-third Amendment, § 1 of which states:

The District constituting the seat of Government of the United States shall appoint in such manner as the Congress may direct:

A number of electors of President and Vice President equal to *the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State,* but in no event more than the least populous State; they shall be in addition to those appointed by the States, but they shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.

(emphasis added). It could be argued that the plaintiffs' claims would mean that the Twenty-third Amendment was superfluous. *Cf. Hobson v. Tobriner,* 255 F.Supp. 295, 300 (D.D.C.1966); Adam H. Kurland, Partisan Rhetoric, Constitutional Reality, and Political Responsibility: The Troubling Constitutional Consequences of Achieving D.C. Statehood by Simple Legislation, 60 *Geo. Wash. L.Rev.* 475 (1992). While this might be a significant issue in resolving the merits, it cannot be decisive at this stage. Constitutional interpretation that renders a provision of the Constitution superfluous may be disfavored, but it does not make the proposed interpretation patently frivolous. *See, e.g., United States v. Stanley,* 483 U.S. 669, 682 n. 6, 107 S.Ct. 3054, 3063 n. 6, 97 L.Ed.2d 550 (1987); Sanford Levinson, Accounting for Constitutional Change, 8 *Const. Commentary* 409, 422–28 (1991).

Or perhaps the language of the Amendment underscored above dooms the plaintiffs' allegations: it seems to imply that the District is not entitled to representation in Congress. But the implication is not strong enough to extinguish the plaintiffs' claims at the threshold of their suits. If the Constitution entitled the District to voting representation in Congress before the Twenty-third Amendment, the underscored language did not *unquestionably* work a repeal. If the Constitution did not entitle the District to voting representation in Congress prior to the Amendment, the Amendment is irrelevant to the analysis—no one is arguing that it *created* such an entitlement. And there

does not seem to be evidence that the Twenty-third Amendment was intended to resolve ambiguity about the right of District citizens to vote in Congress. *See* David E. Kyvig, *Explicit & Authentic Acts, Amending the U.S. Constitution 1776–1995*, at 352–55 (1996). The language of the Twenty-third Amendment very likely reflects the assumption that District citizens had no right to elect voting members of Congress. *See* H. Rep. No. 86–1698, at 2–3, *reprinted in* 1960 U.S.C.C.A.N. 1459, 1460–61. But the assumptions of the participants in the drafting and ratifying of the Twenty-third Amendment do not necessarily indicate the proper interpretation of constitutional provisions adopted by the Founders. In addition, the underscored language appears to have been chosen merely to conform closely to the formulation of Article II, § 1—"Each State shall appoint ... a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in Congress"—rather than to affect the right to elect voting members of Congress. *See* H.R.Rep. No. 86–1698, at 4 (1960), *reprinted in* 1960 U.S.C.C.A.N. 1459, 1462.

Even if there is some apparent tension between the Twenty-third Amendment and Article 4, § 4, that would not render the plaintiffs' claims wholly insubstantial. If essence of the ideal republican form of government is the right to representation in the governing *legislature, see, e.g.,* 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 328 (Jonathan Elliot ed., 2d ed. 1836) ("A republic, where the people at large, either collectively or by representation, form the legislature.") (speech of Charles Pickney, S.C.); *cf. The Federalist* No. 71, at 483 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("The tendency of the legislative authority to absorb every other, has been fully displayed and illustrated by examples.... In governments *purely* republican, this tendency is almost irresistible.") (emphasis added), then the Twenty-third Amendment's establishment of a right to a voice in the selection of the President and Vice–President, as distinguished from the national legislature, would be essentially outside the domain of the

Guarantee Clause. So the Twenty-third Amendment may have been necessary because it provided a right to elect a President, not the Fourteenth Amendment guarantee of a republican form of government.

The plaintiffs' claims also cannot be dismissed out of hand on the basis of the failure of the several states to ratify a proposed constitutional amendment stating that the District would be treated as a State "for purposes of representation in Congress." H.R.J. Res. 554, § 1, 95th Cong. (1978); *see* H.R.Rep. No. 95–886 (1978). The proposed amendment received the support of two-thirds of the members of the House and of the Senate, but was ratified by only 16 states—much fewer than the 38 required—during the period provided for ratification. *See* Kyvig, *supra*, at 420–25. Although the congressional proponents of the proposed amendment maintained that "[i]f the citizens of the District are to have voting representation in the Congress, a constitutional amendment is essential," H.R.Rep. No. 95–886, at 4, a failed constitutional amendment does not alter the meaning of the Constitution, and the views of a failed amendment's congressional supporters have no well-established significance.

Plaintiffs theories are unique. They may well founder, for example, on the specific reference to "states" in the relevant constitutional clauses, the structure of the Constitution, or the Congress' exclusive legislative authority over the District of Columbia. The issues that they raise also may turn out to be non-justiciable political questions, even though the concept of justiciability is becoming murkier and murkier. *See United States House of Representatives v. United States Dep't of Commerce, et al.,* No. 98–0456, 1998 U.S. Dist. LEXIS 13133 at *31, 57–61 (D.D.C. Aug. 24, 1998). Nonetheless, the claims plaintiffs present are sufficiently tenable to justify reference of the case to a three-judge district court.

### III.

■ Finally, plaintiffs argue that this case "comes within the requirements of the ... three-judge statute," and therefore satisfies

the third prong of the *Police Officers Guild* standard. 369 F.Supp. at 548–49. That statute, to reiterate, calls for a three-judge court when a case challenges "the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a). For the purpose of this statute, apportionment means the allocation of congressional districts "among units entitled to representation." *Black's Law Dictionary* 99 (6th ed.1990). Defendants are correct that the District of Columbia is not apportioned a congressional district under the current apportionment scheme. The District's exclusion from apportionment, however, does not mean necessarily that plaintiffs' case does not challenge the constitutionality of the apportionment of congressional districts. In fact, such exclusion, and plaintiffs' prayer for a declaration that the District cannot constitutionally be left out of the apportionment process, indicate that the core of plaintiffs' case is a challenge to the apportionment of congressional districts. It seems clear that an apportionment that, for example, allocated no representatives at all to Alaska could be challenged under § 2284(a). It would be odd if a plaintiff could invoke § 2284(a) where a state was allocated some fraction of the districts to which it were entitled, unless it were allocated no districts at all. Admittedly, it would not be *absurd* if § 2284(a) operated that way. The Constitution explicitly requires that "each state shall have at least one representative." Art. I, § 2, cl. That explicit constitutional directive might have prompted Congress to distinguish between an allocation of no representatives and any other allocation of too few districts. But the plain language of § 2284(a) does not reflect such a distinction. In fact, there is no evidence that Congress made that distinction. The case law that defendants invoke, *see, e.g., City of Philadelphia v. Klutznick,* 503 F.Supp. 657, 658 (E.D.Pa.1980) (denying application for three-judge court because "[n]o existing apportionment is challenged here"); *Federation of American Immigration Reform v. Klutznick,* 486 F.Supp. 564, 577 (D.D.C.1980), does not prove otherwise. In *Philadelphia,* the city of brotherly love was not complaining about the number of congressional districts allocated to the Commonwealth of Pennsylvania or to the city; it was concerned about census practices that might affect a *future* allocation. The situation in *FAIR* was similar: the court concluded that plaintiffs were simply "challeng[ing] ... census practices *potentially* affecting allocations of House members to states," 484 F.Supp. 577 (emphasis added), rather than an *existing* allocation. These plaintiffs, in contrast, do challenge their *existing* allocation of zero representatives. Accordingly, the third prong of the *Police Officers Guild* standard is satisfied.

## IV.

Although the details of their arguments differ on some points, both sets of plaintiffs base their claims on equal protection and a guaranteed right to a republican form of government. The plaintiffs in *Alexander v. Daley* advance additional constitutional arguments. And the *Alexander* complaint, unlike the *Adams* complaint, maintains that the constitution entitled citizens of the District to voting representation in the United States Senate. Since the intersection of the two cases falls within the scope of 28 U.S.C. § 2284(a), it is not necessary to discuss the details of the additional theories of the *Alexander* plaintiffs at this time. *Cf.* 22 *Moore's Federal Practice* § 404.02[2][d][i] (3d ed.1998) (noting three-judge court has discretion to retain jurisdiction of non three-judge claims).

For all the reasons discussed above, the Chief Judge of this Circuit is requested to assign two other judges to participate in hearing and determining the plaintiffs' complaints for injunctive and declaratory relief.